Our next case, if I pronounce it correctly, is Nindig Amperex Technology v. Zhuhai CosMx Battery, 2025, 1037 and 1091. Mr. Franklin, I can assure you that even if I didn't pronounce it correctly, we will do our best to decide it correctly. Thank you, Your Honor. May it please the Court, Jonathan Franklin for the Cohen CosMx. This appeal presents three straightforward legal issues warranting reversal. First, the induced infringement judgment cannot stand because ATL's entire damages case rested on a methodology for determining the infringing U.S. revenue that this Court in Syntec held was unreliable, speculative, and therefore inadmissible. Can I interrupt you at that point? Sure. Just because there are lots of issues here and I don't want to lose track of this one. I'm a little confused by what I think I heard you say because I understood from the briefs except for one, maybe one exception. You're asking to get rid of the damages, and in your briefing at one point it stuck out at me that at one point you say you reverse the judgment on inducement. There was not an inducement issue before us. It's whether the damages for the inducement were appropriate. And therefore, the consequence of that, if we accepted your arguments, would be that we would undo the damage award, not undo the inducement judgment. Am I right about that? Well, I think the judgment is a judgment for damages. That is the judgment. Okay, but it's not the finding or the conclusion that there was inducement here. Your challenge goes to the damages in this case. That is correct, and it's similar to other cases that this Court has had. TechSec is a good example. Wash World is another one. We are, of course, conceding that there's about $1,000, a little more of direct infringement damages, and we're not asking for that to be reversed. So that's a very small amount of products that were directly shipped by Cosmic Samples to the U.S. Are you saying that you're not arguing the correctness of the determination that there was inducement of infringement? Not on appeal, Your Honor, but obviously we've contested that very much, Your Honor. But the problem here was that they have not proven—there's no admissible, reliable, non-speculative evidence to prove damages. So we have cases—TechSec is a good example—where the damages are just nothing for that particular claim. Okay, so the damages, the testimony on the methodology is one issue. What are the other two issues? Sure, Your Honor. The second one also relates to the indirect infringement, and that is whether or not 271B can be applied extraterritorially under the Supreme Court's decision in R.J. Nabrisco, which postdates this Court's analysis, which is contrary reasoning in Muriel. And that's the second issue. And the third one relates to our antitrust counterclaim, and we have shown that the district court erred as a matter of law in imposing a clear and convincing burden of proof on our Norr Pennington claim rather than the normal preponderance of the evidence. So those are the three issues that we have raised on our appeal. Going to the first one again, so the expert here, ATL's expert, just like the expert in Syntec, improperly assumed that, without any evidence, that the U.S. percentage of every Cosmic customer's worldwide revenues from all sources was the same as the percentage of accused products that they imported into the United States. That, as a result, the damages calculations, just like the calculations that were deemed impermissible in Syntec, include vast amounts of non-accused products and services. Well, your friend's main argument, principal argument, as I understand it, with respect to Syntec, and I think this is what the district court judge bought into, was that there's a difference between lost profits and reasonable royalty. So how is this hypothetical negotiation, if we're applying it to reasonable royalty, how's it supposed to go? We're supposed to assume infringement and validity and go in willing to make a deal, but here both parties would understand that no one has any data, any precise data. So how are we supposed to think about a reasonable royalty? First of all, the hypothetical negotiation in this case and in the court's precedence goes to the rate, the actual royalty rate. The base was determined by calculations, not a reason. There was no testimony here that there was an agreement that the parties would, in fact, do this. This was something that the expert did after he had then determined the rate through the Georgia-Pacific factors, and you can see that, Your Honors, at the trial testimony. So he did not, in his trial testimony, his testimony about what the products were, excuse me, what the reasonable, what the base was, came after what he talked about, the negotiation. And so what we have here is the same thing in Syntec. It was a calculation. He said there's no direct evidence of what the importation rate is. So I'm going to use every product. So let's take one customer. Let's take Amazon, for example. Amazon makes more than a trillion dollars. I think I take your point. Let me move on to a – let's assume hypothetically that we were to agree with you about the damages calculation. Then the question remains whether a remand or reversal is appropriate on that issue. There are other issues going on here. There are. And so what's your best argument for why it seems like in most cases, more often than not, we remand it and let the district court judge evaluate whether he thinks a new trial for damages would be appropriate or warranted or waived, not that we decide that here. So why should we decide that here and not remand it to the district court? For a couple of reasons, Your Honor. First, I don't – I would maybe take issue that that's the normal way. Wash World was a recent case. It's a good example. The court said there's no – I know, and it's hard to follow the precedent because it's all in different circles. Fair enough. Fair enough, Your Honor. But I do think – let's say Promega is an excellent case there because this is a situation in Promega where they just went all in on one damages methodology. They said to the court, and they said it repeatedly, we don't have anything else. And that's what we have here. We have statements – Yes. Procedurally, it was the district court that went first and reached the conclusion that no, this patent owner plaintiff has waived other alternate damages theories, and then that was appealed to us, and then we gave respect to that ruling on waiver. Yes, Your Honor, although I have looked at that opinion and the court did not indicate anywhere in the opinion that there was another option that could have been in this case because there was a clear waiver. I think we said there's no use of discretion in the denial of a motion for a new trial on damages. Yes, Your Honor, and I think – my recollection is Your Honor may have offered that opinion for the court. It's the court's opinion. Yes, I understand. But I do think if you look at the analysis in that case, it was a law of the case ruling about waiver, and I think this court is in equally good position to evaluate waiver. And here we have – it's very easy because ATL has made it clear in its own brief to this court that it neither could present nor has any evidence, any alternative evidence. But to put a finer point on their position, it's that there was no other readily available data they had access to. Well, at page 26 of their brief to this court, this is footnote 5, there is no such information now that can be used to determine the number of infringing imports. Right. So the point is, you know, there's nothing like any other data in the publicly available 10-K filings or something like that that they can readily use. They're not saying that there's no other damages theory that they can – they could create perhaps taking evidence or seeking more evidence in different ways than what is readily available. Discovery has closed here, so there's no further discovery. And they do say that it was, quote, on 21, he used the most precise damages model available. That's a statement in their brief to this court. On 20, he used the best available evidence. On 8, he could not reasonably have obtained more accurate data. So they are going all in just like – I mean, this is what happened in – Understandably, because they want to win on the issue, and that's the only way they get to win. By their theory of the damages is that we were allowed to use this because there was nothing else. And if they don't win, Your Honor, then I think they have to be held to that choice, that strategic choice that they've made. Just as in PROMEGA, TXEC is another example which followed PROMEGA. In that case, they said there was – the court held there was no – But let's discuss extraterritoriality.  Marial versus RJR Nabisco. Yes. RJR Nabisco didn't overrule Marial, but it certainly laid out a methodology that might support your position. Do you want to address that? Yes, Your Honor. With some trepidation that I do, given I know that Your Honor did offer that opinion for the court as well. But I do think that in – the analysis in Marial is kind of the reverse of the analysis that the Supreme Court says was correct in RJR. What the court said in Marial was because we don't have anything about extraterritorial in the statute, we're going to say it is extraterritorial. And the Supreme Court's analysis is the exact opposite. If there isn't anything in the statute, it is not extraterritorial. And so that is a direct – directly contrary reasoning. And the Supreme Court has made that clear since Marial. And therefore, under Troy and other cases we've cited, this panel can, in fact, hold that the reasoning was undercut. That is the – What if the fact that 271B says nothing about territoriality sticks out like a sore thumb compared to 271A, 271C, I think 271G. And so we have all these other clear constraints on all these closely neighboring, very related infringement provisions. And yet there's no such constraint on 271B. Maybe that means 271B sort of sticks out like a sore thumb and doesn't – and Congress is telling us that there is no territorial constraint on inducing acts. But in order for Congress to tell you under RJR and the analysis it applies, it has to be a clear, affirmative statement of an intent to apply extraterritorially. That's the key question. Does it really have to be a statement? Does it have to be an express statement? Well, it has to be clear and affirmative. And what we're talking about here is a negative. We're saying we're going to infer it because it's not there and it might be somewhere else. Now, what we have in F and G, those were actually responses to court decisions holding that extraterritoriality applied, and they were Congress modifying the statute. So what we have here in 271B is if the court holds, as we think it should, that it doesn't apply extraterritorially, then Congress can go back and provide a statement about when it could or should. I mean, maybe my colleagues are way ahead of me. The problem I'm having is that we have a panel decision, and the only way ordinarily we can overturn a panel decision or revisit it is en banc. We're not en banc here. And the only other way we could do it is if there's an intervening change in law or a new law. My reading of the historical record here is that there was a case called Morrison that said exactly what RJR said. That preceded Muriel.  So Muriel was decided in the face of that case. So I'm not clear on how we can say that RJR was intervening change in law that could justify a panel overturning a prior panel decision without going en banc. Yes. So Troy, in the case we cited, says that if it undercuts the reasoning, then the panel can, in fact, say that the Supreme Court case supersedes. Morrison was— But isn't that intervening? Yes. And my point is Morrison preceded Muriel. So Muriel didn't cite Morrison at all, nor did Muriel apply any kind of a clear statement rule. And I think the reason is if you look at Morrison, there was disputes about specific statutes and whether they should or shouldn't be extraterritorial. I don't think it was until RJR that the court established a two-step uniform universal test for all statutes. And that's why, to be charitable, I think that's why the court didn't have a clear statement rule or apply it in Muriel and, in fact, applied the opposite of a clear statement rule, which is a negative inference. I hear—I see I'm in my rebuttal, but I'd be happy to— Can I ask one more question? Yes. Okay, just on another issue, which is the enhancement of damages. Yes. Do you agree, even if we were to agree with you on the damages issue, what do we do with the enhancement? There's a million-dollar enhancement.  That would be vacated. Yes. But there's still a potential for enhancement with respect to the direct infringement. Well, there— So do we send it back to the district court to sort out the amount of the enhancement damages? The first answer is yes, and the second is I don't think there was going to be much of an issue. If it's only $1,000, which is what we calculate the direct infringement, I think that's below the threshold for enhancement. But even if it isn't, that would be— The cap would be triple. $3,000. So, yeah, I mean— But that's something the district court— Yeah, that particular issue, you vacate that issue along with the running royalty, which is another one of these post-trial things. We would say yes. Counsel, we'll give you three minutes of rebuttal time. Thank you very much. I appreciate that. Mr. Powell. Good morning, Your Honors. May it please the Court, Mike Powell for the appellee and cross-appellant. Hitting on perhaps the last point first, which is the propriety of a remand, there was no waiver in the district court here of any particular damages model. We were not locked into a damages model. We actually had our damages model approved by the trial court, and we presented that to the jury and were successful. If there were a remand because of the precedent of Syntec finds that the importation data is unreliable, that data is necessary for the particular model we presented. But we have at our option on remand other models that can be used. An example would be a lump sum royalty that is recognized as another alternative in these types of cases. Did you present this in the red brief? I don't recall seeing other than seeing we've got enough evidence. You can't open, let's assume you can't reopen discovery, that we would have presented these other damages models or whatever. I didn't see any of that. I don't think we mentioned lump sum as one of the options, Your Honor. I apologize for that. But we did mention that upon remand we should have opportunity to present different theories of damages. But how does that jive with the principle argument you've made here on the merits case on damages? There's no way we had enough data to do this, so we did the best we could. How do we reconcile those two divergent lines in this case? So I think if we want to take Syntec for what Syntec is, it's a lost profits case. There was a reasonable royalty damages award in that case that was not appealed. So the only issue was whether or not the importation data was reliable enough to prove exactly how many sales occurred in a lost profits scenario. There was a double-down problem in Syntec where there was an import estimation made on 10K information that was arguably over-inclusive, included products other than the infringing products. That was then used to multiply by an estimated. No, I understand. I'm sorry. I don't want to cut you off, but my point maybe I didn't make myself clear. You have represented in the briefing here and probably in the whole record your main justification. ATL has made quite clear that it took its best shot in trying to prove inducement in this case. Page 41 of Blue Brief and found that there is no evidence that ATL could have reasonably obtained more accurate data. So this record is replete with your saying, this is the best we had. We didn't have any more data. So why is that close enough, not close enough to a waiver of any other way? Essentially, I read this, you said repeatedly, there was no other way we could justify damages in this case. We didn't have enough data. Why isn't that close to a waiver? Again, I may repeat myself, but it was to emphasize that for the model we chose, we needed to estimate how many of the lithium-ion batteries that were sold to COSMEX's customers ultimately made it to the United States. But you made a choice of a model. You didn't put in alternatives. We see a lot of cases where there are alternative models for damages, for award of damages. You picked one, right? We did, and that model was approved by the court, so we had no reason to introduce a secondary model. Keep in mind, Syntec came after our damage report was locked in. Syntec decision came down a month after. But before trial. It did come down before trial, but the issue was presented to the court on a Daubert motion, which we successfully convinced the court Syntec shouldn't apply in the context of a reasonable royalty, which is really, I think, what I'd like to try and explain to the court, how you can distinguish Syntec so that we don't have that problem in this case, if I may.  So on Syntec, because of his lost profits case, the objective of the evidence is to show how many instances of sales actually took place. That's in order to look at the but-for world. Could the patent owner have satisfied that demand and met that demand with its own products? That's pretty different from a reasonable royalty, where there's a hypothetical negotiation intended to mimic what parties would do in the real world. What I think the question the court needs to address is not, is the importation data 100% reliable for this purpose, but is it the type of data that ordinary business people, similarly situated to these parties, would look to in a negotiation to try and figure out, how are we going to monitor the infringing products that make it into the United States? And under that construct, we believe that there was sufficient evidence presented to the court to show, and Mr. Ratliff presented this evidence both in his expert report and his testimony, that that is the type of evidence that would be used by ordinary business people, and we believe that's the standard to be used in the Georgia-Pacific analysis. That's how we think we distinguish Syntex. The thought I didn't finish about Syntex is there is an additional problem not present here, where it was use of the importation percentage and also use of an estimated market share, in an effort to prove actual instances of infringement. That's too many ifs and too many whens on the process there for lost profits. Our importation percentage is a proxy. We took company-wide importation information as a proxy to apply to what were actually the devices that had the batteries, like cell phones, like laptops, like tablets. Counsel, why don't you address extraterritoriality? Absolutely, Your Honor. We believe that the Muriel decision remains good law. If you look at the history, it actually goes back to 2006. We actually are 20 years removed from the DSU Medical Corporation case that's cited in the papers that approved a jury instruction recognizing that 271B is differently situated than the other 271 provisions, in that it's not tied to the United States. That decision held firm. You have a Supreme Court case, Global Tech, which comes later in 2011. It also recognizes and accepts that the conduct can be extraterritorial under 271B. Remind me again, in the Global Tech opinion, nobody raised the argument of whether activities going on in Hong Kong create 271B liability, given that it's done extraterritorially, right? It does not appear to have been a disputed issue, at least in the reported decision. It was clear from the factual record and the briefing supporting the petition to the Supreme Court that the friars in that case were actually made and delivered in China and or Hong Kong. So it was clearly extraterritorial sales, but the issue wasn't actually disputed and discussed. The next step in this cycle is the Muriel decision in 2012. It has not been overruled. And following that, we have power integrations in 2016. That was December 12th, 2016, which, again, affirmed liability for induced infringement where the defendant sold the chips overseas in a worldwide distribution model. We then come to RJR Nabisco, which is June 20th of 2016, so just before, actually, the power integrations case. RJR was not a patent case. It was dealing with a RICO statute, and it did not change the law. In fact, the language from RJR that's cited by my opponent here is coming from Morrison. Morrison had the very stern language that says, when a statute gives no clear indication of an extraterritorial application, it has none. That's a quote from Morrison. That's the same law that RJR reiterates, and it reiterates the same two-step process. You have to look at the statute and the context of the statute to determine, is there a clear indication of extraterritorial application? If you don't find it in the words of the statute or the context of the statute, then you look, is this a domestic application? We actually think our case meets both. We do think we have extraterritorial approval in 271B. If we didn't, we do think this case presents a domestic application of that statute. We know that RJR Nabisco is not the best marker for patent cases, so we look to Western Gecko. This is a Supreme Court case dated June 22, 2018. This is a patent case, and it looked at Section 284, not part of 271, not limited with language saying the United States, so they found that it did not evidence extraterritorial reach on its face. They didn't reach that question. What they decided to do instead is go to step two. Let's look at domestic application. They found clearly that Section 284 in that case was a domestic application of the statute because it referenced the underlying infringement. That was what the statute was intended to remedy, to give damages for that. I'm not correct here. The party that manufactured the battery component that is patented here then passed on that component to the battery manufacturer, which then incorporated the battery into a final product, which was then imported into the United States, so that the punitive infringement was quite distant from the importation. The steps in the supply chain are all controlled by the customer in this case, so you're right that there are many stops on the way to the United States for the battery cells that my client and the defendant in the underlying case made, but all of that activity is controlled by the customer, who is the direct infringer here. The customer is the one who's importing smartphones, tablets, and laptops with batteries. Who's the inducer? That happens to be, in this case, COSM-X. Now, there's no objection that we proved inducement in the underlying trial, and the inducement comes in the form of U.S.-based certifications that show they make the battery and specifically deliver it to their customers so that they can be imported into the United States. That's not on appeal. That issue has been decided in our favor. So there was evidence to support that. If I might just finish this chronology after Western GECCO, which is similar and should be reviewed closely, we think it supports our case. There was the M-Class display decision, November 19, 2018, which actually applied Mariel. So now you have the Mariel logic being applied post-RJR and post-Western GECCO. We think that's a clear indication of its continuing viability. So the question isn't whether Mariel applies to these facts. The question is whether Mariel is still good law. And we absolutely think it is, for the reasons articulated by Judge Prost, that this panel can't overturn Mariel on its current posture. Well, that was a question. Sorry. We believe that that question is the right answer, which is this panel doesn't have the power to overturn it. There was no intervening change in law because RGR simply adopts the Morrison standard and rolls it forward. Can I go back to the first point? Yes. Because I'm still unsettled about the damages and the waiver issue. Do any of the theories, and I'm not sure you listed more than one alternative theory that you might pursue and that you think you haven't waived, but do any of those alternative damage theories, don't they also depend on knowing how many infringing products made it into the U.S.? And so won't they suffer the same fate as the damages model that we've got before us, assuming that we get rid of it? Yes. So we would be looking for alternative ways that the parties in a hypothetical negotiation would try and estimate the trigger for the royalty. As I mentioned, a lump sum doesn't use an ongoing type royalty analysis. It's going to estimate the value of the patented technology for a one-time payment. So that's one option. If the importation data that we use is unacceptable, we'll have to find an additional evidentiary basis for the parties to negotiate how to trigger the royalty. Which would affect what the volume of sales are, how many infringing products made it to the U.S. I'm not sure. Do you agree with that, that any kind of damages calculation that might be done otherwise under some other theory would necessarily implicate? No, I don't, because under the Lucent case, which predates the Syntec case, in a reasonable royalty context, Lucent held, you don't need to prove each instance of underlying infringement, direct infringement, to prove indirect infringement and get your royalty damages. Obviously, it's a consideration under Georgia-Pacific, the extent of use of the invention. That's what we're talking about here. How much use has there been? And one indicator of that is how many sales of the accused product have been sold. We know that information. It's global. We just need to try and narrow it down to how many come into the United States. Give us some color on what you would do to refine the base that you currently have now, and if this court rejected this importation rate as a proxy. I think one option would be to look for overall market share, global and then within the United States, of the customers and perhaps of the lithium-ion battery makers themselves. Mr. Ratliff did actually introduce testimony at trial here related to lithium-ion batteries, small lithium-ion battery manufacturers and their global market share. That data was available and is in the record. We would then try and extrapolate from that how much of that applies to the United States. We may have to— But we've been there and done that, right? I mean, that was what you were trying to do in this instance, and it's not— In this instance— We conclude it wasn't workable or sufficiently reliable. In this instance, we took a detour to look at customers' published 10-K results, which, by the way, are reliable data, right? These are sworn under oath. They have to be— Assume we get rid of that. So then what do you do? Then I think we'd look at the lithium-ion battery market share data that was presented at trial, and we would have to consider what the parties would do to extrapolate from that how that market share applies in the United States. Is it one-for-one, or does it need to be adjusted for some reason because the United States is differently situated than the rest of the world? Counsel, you have used all your time, so there will be no time for rebuttal if that issue was not raised—cannot be raised anyway in rebuttal. So thank you for your argument. Thank you. Mr. Franklin has some—three minutes for rebuttal. I'll see if I can do that. On what was argued. Yes, indeed. To start, on the waiver point, there—if you want to go back to the Dober—pages 18, 014, and 15 of the appendix, they said he used the, quote, only available data source. This was in the trial court. This was after we had raised Syntec. They doubled down on that. He's now saying—my friend over here is now saying he's got other data. That is not what he told this court. He told this court in his brief he had no other data. We had—the way the briefs go, we said there's no data. They said in their response brief, we have no data. We couldn't present any other data. There's nothing we could do. Now he's saying a lump sum royalty. That's an entirely different analysis, but Your Honor is correct. It would, in fact, need to rely on some form of data involving importations, but that was never argued below. It was never argued in the red brief. It's been waived three times over. In the trial court, here in this court, and at this argument too. So in terms of the Syntec, Syntec applies. Niazi and power integrations were two reasonable royalty cases. Those are the two cases that this court relied on in Syntec to hold that this was an inadmissible methodology. If those cases didn't apply because reasonable royalties don't have anything to do with this case, the court would not have cited them, much less relied on them. In Syntec, he talked about proxy. The same proxy was used in Syntec, the exact same proxy. In fact, the analysis is, in fact, identical. They used 10K reports for customers and said, what's your overall worldwide revenues? That includes, for Amazon's cases, trillion dollars in revenue, and those of them having to do with infringing lithium-ion batteries. So the analysis in Syntec that was deemed impermissible is the exact same analysis that was used in this case. To move to extraterritoriality, I believe, and your honors are in a much better position, but I believe that Muriel would have applied the RJR clear statement rule if it had thought it applied. I believe the court would have faithfully applied that if the court had thought that was the analysis. The court did not apply that because it wasn't until RJR that the Supreme Court formalized this two-step process. The other cases that were cited did not raise this issue. They did not raise the issue in N-Class. N-Class, in fact, supports us on damages, but did not raise that issue in N-Class. In terms of Western Eco, that was an F case, 271F, and it supports us. The court looked at where is the conduct that it regulates, and in that case, it was the act of importation. Here, in this case, it is the inducement, all of which occurred abroad. And finally, the Syngenta case, also that implied G, that strongly supports us, and that involved the focus is where the acts giving rise to the liability. The only acts that give rise to the liability in this case are the acts of inducement, and all of those actions occurred abroad in China. For that reason, we ask that the court vacate or reverse the damages award and not give them another bite at the apple. Thank you. Thank you to both counsel. The case is submitted.